IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ROSETTE NEWSOME o/b/o ) | |
| RASHEED BELL, ) | |
|   ) | |
| Plaintiff, ) | |
|   ) | |
| v.   ) | CIVIL ACTION NO. 1:04cv1231-SRW |
|   ) | WO |
| JO ANNE B. BARNHART, Commissioner ) | |
| of Social Security, ) | |
|   ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Rosette Newsome o/b/o Rasheed Bell[1] brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income under the Social Security Act.  The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c).  Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

On March 23, 2001, plaintiff filed an application for Supplemental Security Income (SSI).  On April 29, 2002, after the claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing.  The ALJ rendered a decision on May 28, 2002,

---

[1] For convenience, the court will refer to Rasheed Bell as the "plaintiff" for purposes of this memorandum of opinion.

in which he found that plaintiff was not under a disability as defined in the Social Security Act at any time through the date of his decision. On November 18, 2004, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff, who was born on April 25, 1995 and was seven years old at the time of the ALJ's decision, challenges that decision on three grounds. He argues that: (1) the ALJ

erred by ignoring portions of the treating psychologist's opinion which indicate that plaintiff has an extreme limitation, (2) the ALJ erred by failing to address plaintiff's oppositional defiant disorder, and (3) new evidence submitted to the Appeals Council warrants remand. Upon review of the record as a whole, the court concludes that the ALJ's decision should be affirmed for the reasons discussed below.

1.      Treating psychologist's opinion

While acknowledging that the ALJ gave substantial weight to the opinions of Dr. Randy Jordan, plaintiff's treating psychologist, plaintiff contends that the ALJ improperly ignored a portion of Dr. Jordan's medical records which indicate that plaintiff has "extreme limitation." Plaintiff's brief at 6. The extreme limitation to which plaintiff refers is plaintiff's Global Assessment of Functioning (GAF) score of 50 on Axis V of Dr. Jordan's April 4, 2000 report. Dr. Jordan gave no specific explanation for this score in his report, and he did not assign any GAF score to plaintiff on any examination after his initial visit. Like Dr. Jordan, the ALJ did not specifically discuss this Axis V diagnosis, although the ALJ did review Dr. Jordan's major findings at considerable length in his decision. R. 18-19.

The opinion of a treating physician . . . "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)). The Eleventh Circuit "has concluded 'good cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical

3

records." Id.  When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate [his or her] reasons.  Id.  However, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision ... is not a broad rejection which is 'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole.'" Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). [2]

The Global Assessment of Functioning Scale is used to report an individual's overall level of functioning.  Diagnostic and Statistical Manual of Mental Disorders 30 (4th Edition 1994) ("DSM-IV").  "A GAF code of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), [or] serious impairment in social or occupational functioning (e.g., no friends, unable to keep a job)." Hurley v. Barnhart, 385 F.Supp.2d 1245, 1262 n.5 (M.D. Fla. 2005)(citing DSM-IV at 32). However, the Commissioner "has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 Fed.Appx. 684, *692 n. 5 (11th Cir. 2005) (citing 65 Fed.Reg. 50746, 50764-65 (Aug. 21, 2000)).

---

[2] See also Ogranaja v. Commissioner of Social Security, 2006 WL 1526062, *3 (11th Cir.2006) (unpublished) ("We do not require the ALJ to 'specifically refer to every piece of evidence in his decision,' so long as the decision is sufficient to allow us to conclude that the ALJ considered the claimant's medical condition as a whole."); McCray v. Massanari,175 F.Supp.2d 1329, 1336 (M.D. Ala. 2001) (ALJ must consider all medical evidence that is credible, supported by clinical findings, and relevant to the question at hand, but is not required to discuss every piece of evidence submitted.  Further, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.).

Further, "[t]he GAF score is not an assessment of a claimant's ability to work, but a global reference scale to aid in the treatment of an ongoing condition." Sparks v. Barnhart, 2006 WL 1633828, *4 n. 1 (N.D.Ala. 2006).  "[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." Wilkins v. Barnhart, 69 Fed.Appx. 775, 780 (7th Cir. 2003).

In this case, Dr. Jordan assigned a GAF to plaintiff only once, on April 4, 2000, Dr. Jordan's first visit with plaintiff.  The latter was referred to Dr. Jordan "secondary to possible ADHD and behavioral problems."  R. 132.  Dr. Jordan found after extensive testing that plaintiff needed psycho-stimulant medication for his ADHD and, in addition, he recommended that plaintiff's mother use better methods to discipline the plaintiff as she "more or less allows this child to rule her world and to boss her as opposed to being the guiding figure in his life." R. 133.  On May 2, 2000, plaintiff returned after being placed on Adderall.  Plaintiff's mother reported that his teacher could see a "vast improvement" in plaintiff's behavior, but that she herself "does not get the benefit from the Adderall." R. 130. Dr. Jordan indicated in his notes that, in his view, plaintiff's mother "continues to be a parent who wishes actually to not discipline and is very slow to engage in discussion concerning how she needs to discipline Rasheed."  Id.  Dr. Jordan found that plaintiff remained "quite strong-willed," but that the Adderall was working efficiently and plaintiff had improved substantially on a number of tests.  Id.  He recommended that plaintiff's doctor give a 5 mg booster at lunch "until mother has been able to incorporate some adaptive parenting skills." Id.

On May 31, 2000, Dr. Jordan found that plaintiff was doing well on Adderall and noted that, although plaintiff's mother still had concerns about plaintiff's behavior, "so much of what he is doing is actually childlike and she has such poor parenting skills, I really do not think this is a medication issue, as much as it is a parenting and behavior-shaping issue." R. 129. On June 30, 2000, plaintiff's mother reported that plaintiff's behavior was somewhat better, although he was having some trouble going to sleep at night. Dr. Jordan commented, "I still feel as if mother wishes to have a child that she is not going to have, but do believe that Adderall might be increased to 10 mg and perhaps Clonidine added at night." R. 128. On August 2, 2000, Dr. Jordan noted that the combination of Adderall and Clonidine was "working quite nicely. Some very, very mild hyperkinetic behavior is still noted, but overall things are much improved." R. 127. Further, on October 4, 2000, Dr. Jordan reported that "Rasheed's mother says that the Adderall 10 mg a.m. and 5 mg. at lunch is working very nicely along with a half tablet of Clonidine at night for sleep. He essentially is asymptomatic with medication." R. 126. Although plaintiff was receiving some notes from his school about afternoon behavior at this time, this problem appears to have been caused by plaintiff's mother's decision not to give him his lunchtime dose "on purpose so that the teacher would see that he truly needs the medication, as she feels as if the teacher does not believe her that he needs it." Id.

There are no further records from Dr. Jordan until February 2, 2001. At that time, plaintiff's mother reported that plaintiff was not doing well – he had only gotten "10 smiley faces out of 100 days." R. 125. Dr. Jordan noted that this was "in direct contrast to what

6

she last reported when she said that he was doing nicely," and said that "[i]t is really difficult to know at this point in time exactly what is happening."  Id. [3]  The record reflects no other visits until September 5, 2001.  On that date, Dr. Jordan reported that plaintiff's mother had stopped plaintiff's medication and had not returned based on her perception that Dr. Jordan did not think that she was a good mother.  R. 149.  They discussed "possible initiation of medication once again."  Id.  On September 24, 2001, Dr. Jordan talked with plaintiff's mother about plaintiff's need for continued stimulant medication.  R. 150.  On November 19, 2001, Dr. Jordan and plaintiff's mother discussed ways to get plaintiff to take his medication, and Dr. Jordan commented that "really in all the symptoms that she is suggesting, I see hyperactivity, which at first needs to be medicated and not otherwise."  R. 151.  There are no records indicating that plaintiff made any further visits to Dr. Jordan.

In light of Dr. Jordan's treatment of plaintiff subsequent to the initial GAF score, and his finding thereafter that plaintiff "essentially is asymptomatic with medication," R. 126, the ALJ did not err in failing to discuss this score.  He correctly concluded that while "Dr. Jordan's office notations detail some waxing and waning of symptom intensity and fluctuating behavior problems ... overall, the evidence shows that the claimant continued to benefit from his medications and that he was 'much improved.'"  R. 18.  As the ALJ noted, "the claimant remained on the same regimen of treatment throughout and despite an ill-

---

[3] The instant claim was filed on March 23, 2001. R. 16. Plaintiff filed previous applications on March 12, 1997, and February 17, 2000, which were denied on January 25, 1999 and October 25, 2000, respectively.  Id.

7

advised and self-determined cessation in medication in November 2001, the record does not contain any evidence of marked or severe limitations in any area of functioning." Id. at 19. This description of plaintiff's progress after he initially presented to Dr. Jordan is supported by substantial evidence. The ALJ did not err in failing to discuss plaintiff's original GAF score of 50 specifically, as it is reasonable to infer that this score would have improved substantially during plaintiff's course of treatment when plaintiff was compliant with his prescribed regimen of medication.

The court concludes that the ALJ properly considered plaintiff's medical condition as a whole. The ALJ did not choose to disregard the GAF score assigned by Dr. Jordan on plaintiff's first visit – he simply did not refer to that score specifically in his decision, which properly took into account Dr. Jordan's description of plaintiff's symptoms, limitations, and course of treatment. The court finds no error in this approach.

2.    Oppositional Defiant Disorder

Plaintiff maintains that the ALJ "did not evaluate Rasheed's opposition defiant disorder," and contends that "[t]he ALJ's failure to address this condition is reversible error because there is no way for a reviewing court to determine whether Rasheed's opposition defiant disorder was considered at or beyond step two of the sequential evaluation process." Plaintiff's brief at 9. The court cannot agree.

Dr. Jordan gave plaintiff a primary diagnosis of attention deficit hyperactive disorder

8

and a secondary diagnosis of oppositional defiant disorder (ODD)[4] during his initial evaluation of plaintiff on April 4, 2000. R. 133. Dr. Jordan did not repeat or refer directly to the ODD diagnosis thereafter in his notes. In turn, the ALJ did not specifically discuss plaintiff's diagnosis of oppositional defiant disorder in his decision, nor did he address whether or not this condition represented a severe impairment.

It appears to the court that the ALJ may have omitted specific reference to Dr. Jordan's secondary ODD diagnosis because plaintiff did not claim that he was disabled on this basis. The ALJ's decision indicates his understanding that "[t]he claimant is a 7-year-old child alleging disability beginning March 5, 1997, *due to attention deficit hyperactivity disorder (ADHD)*." R. 17 (emphasis added); see also R. 18 ("At the hearing, the claimant's mother testified that Rasheed is disabled *due to attention deficit hyperactivity disorder* ....")(emphasis added). Plaintiff's disability report does not mention oppositional defiant disorder as a basis for his claim. R. 73-96. Further, at plaintiff's April 29, 2002 hearing, the ALJ inquired, "What would be the basis of Rasheed's disability?," R. 31, and plaintiff's

---

[4] "Oppositional Defiant Disorder is a recurrent pattern of negativistic, defiant, disobedient, and hostile behavior toward authority figures that persists for at least six months and is characterized by the frequent occurrence of at least four of the following behaviors: losing temper, arguing with adults, deliberately doing things that will annoy other people, blaming others for his own mistakes or misbehavior, being touchy or easily annoyed by others, being angry and resentful, or being spiteful or vindictive. The behaviors must occur more frequently than is typically observed in individuals of comparable age and developmental level and lead to significant impairment in social, academic, or occupational functioning." Goodman ex rel. Chambers v. Barnhart, 247 F.Supp.2d 1249, 1251 (N.D. Ala. 2003) (citing DSM-IV).

counsel replied, "Your honor, it's based on his attention deficit disorder ...." Id.[5]

However, even if the ALJ understood plaintiff not to be claiming disability based on ODD, the better practice was for the ALJ to make an explicit determination as to whether plaintiff's secondary diagnosis of ODD constituted a severe impairment at step two of the sequential evaluation, since at least some medical evidence indicated the existence of such an impairment. See, e.g., Williams v. Barnhart, 186 F.Supp.2d 1192, 1198 (M.D. Ala. 2002) (ALJ erred in failing to consider or address the severity of certain impairments.). Nevertheless, the court finds that the ALJ did consider and discuss the underlying evidence relating to plaintiff's ODD and properly discounted it. See McCray v. Massanari, 175 F.Supp.2d 1329, 1336 (M.D. Ala. 2001) (While she did not characterize them as being severe or non-severe, the ALJ also considered, and properly discounted, plaintiff's complaints of shoulder pain, and dyspnea, or shortness of breath.).

Specifically, the ALJ noted plaintiff's mother's description of problems with plaintiff's behavior, such as the fact that he "will jump on the table and bed and generally 'not mind' at home and also misbehave in school." R. 18. The ALJ also discussed Dr. Jordan's report of complaints of plaintiff's "behavioral problems" including "arguing with

---

[5] Later in the hearing, plaintiff's counsel did mention the oppositional defiant disorder diagnosis, although without indicating clearly whether or not plaintiff was claiming disability based on ODD:

> ATTY: ... He was diagnosed with ADHD and opposition defiant disorder. And those are conditions that can fluctuate and vary as the child ages. You got, I believe, the opposition defiant disorder can progress into conduct disorder if it's not, you know, adequately treated or arrested."

R. 32.

adults, pushing others, and having to be redirected and/or told to sit down." Id. He mentioned Dr. Jordan's comment that, "[b]ased on [the mother's] own description, Dr. Jordan felt there was a lack of effective parental discipline complicated primarily by oppositional and some hyperkinetic behavior," noted Dr. Jordan's efforts to control this behavior with medication and counseling concerning effective discipline, and reviewed the evidence that plaintiff benefitted from his medications when he took them and was "'much improved'" and, indeed, "'asymptomatic.'" R. 18-19.

The ALJ also discussed a 2001 questionnaire in which a teacher indicated that plaintiff "continues to be impulsive and to demonstrate some inappropriate, but not excessive, oppositional behaviors with a severity rating of '3' out of '5' in most areas. R. 19. The ALJ noted that the teacher "clarified that this is partly related to the fact that [plaintiff] has not learned and/or been shown or instructed in the appropriate way to behave"; that in an updated report from the following year, plaintiff's teacher reported that plaintiff's medication was helpful and he was not considered "'significantly different'" in functioning compared with other children; and that the teacher reported no problems in his ability to interact with peers, teachers, and other school personnel. R. 19-20. The ALJ concluded that "the record does not contain any evidence of marked or severe limitations in any area of functioning." R. 19.

Given the ALJ's thorough discussion of the evidence in the record concerning plaintiff's oppositional behavior, the court finds that – to the extent that the ALJ erred in failing to make an explicit determination as to whether plaintiff's secondary diagnosis of

ODD constituted a severe impairment at step two of the sequential evaluation – the error was harmless. "[W]hen an incorrect application of the regulations results in harmless error because the correct application would not contradict the ALJ's ultimate findings, the ALJ's decision will stand." Miller v. Barnhart, 2006 WL 1490162, *4 (11th Cir. 2006) (citing Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir.1983); Wright v. Barnhart, 153 Fed.Appx. 678, 684 (11th Cir. 2005) (same). In this case, Dr. Jordan placed no explicit limitations on plaintiff because of this disorder. Further, the ALJ did not reject Dr. Jordan's secondary ODD diagnosis. Rather, he thoroughly discussed the oppositional behavior in question. The ALJ's decision that plaintiff had a less than marked limitation in the domain of interacting and relating with others is supported by substantial evidence.

3. New Evidence

After the ALJ rendered his decision in this case on May 28, 2002, the Appeals Council received additional medical records from Dr. Nelson M. Handal (dated June 24, 2002); a letter from third grade teacher Jackie Glover (dated June 21, 2004); and additional treatment records (dated May 2003 through May 2004). R 155-75. The Appeals Council considered the additional evidence, but found that the information did not provide a basis for challenging the ALJ's decision and, thus, denied the request for review. R 4, 7.

Plaintiff appeals the Appeals Council's decision denying review. Thus, the court must review the record as it was before the Appeals Council, which included the newly submitted records. See Fry v. Massanari, 209 F.Supp.2d 1246, 1252 (N.D. Ala. 2001) (citing, *inter alia*, Falge v. Apfel, 150 F.3d 1320, 1324 (11th Cir.1998) (Where the claimant specifically

challenges the decision of the Appeals Council to deny review, the record for the district court's consideration will include any new evidence submitted by the claimant after the ALJ's hearing and decision.). "When a district court is hearing such a challenge, its duty ... is a three-fold inquiry. It must find whether the claimant has proven 'that (1) there is new, non-cumulative evidence, (2) the evidence is "material," that is, relevant and probative so that there is a reasonable probability that it would change the administrative result, and (3) that there is good cause for the failure to submit the evidence at the administrative level.'" Fry, 209 F.Supp.2d at 1252 (citing Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1067-1068 (11th Cir.1994)).

In this case, the new records, which largely date from 2003 and 2004, do not relate to the time before the ALJ's decision on May 28, 2002, and do not discuss plaintiff's condition (other than by history) during the period for which benefits were denied. See 20 C.F.R. § 404.970(b); Otto v. Commissioner of Social Security, 2006 WL 700934, *3 (11th Cir. 2006) (unpublished) (Test results immaterial where they were from a different time period and contained no discussion of what plaintiff's condition might have been as of the date of the determination.); Blake v. Massanari, 2001 WL 530697, *9 (S.D.Ala. 2001) ("[I]n order to be material, the new evidence must 'contai[n] a medical opinion on the presence of the impairment during the time period for which benefits are sought.'"); Sullivan v. Apfel, 2000 WL 1568330, *8 (S.D. Ala. 2000) (unpublished) ("An implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the

13

previously non-disabling condition."). Thus, these records do not meet the materiality standard.

Dr. Handal's June 24, 2002 assessment is the only record that is close in time to the ALJ's decision. R. 155. However, this assessment, too, fails to discuss plaintiff's condition during the period for which benefits were denied, other than by history. Further, the court reads the GAF of 50 assigned to plaintiff by Dr. Handal only as evidence of plaintiff's condition on that specific date, as plaintiff's prior (and subsequent) history clearly indicates that plaintiff's functioning is strongly affected by whether or not he is currently taking medication, and whether or not that medication has ceased to be effective and new medication is necessary.[6] See R. 157 (Dr. Handal's instruction to discontinue Risperdal and Metadate "due to inefficacy" and start Zoloft on June 24, 2002.); R. 158 (letter from Jackie Glover, third grade teacher at Abbeville Elementary, indicating that "[t]here were times during the [school year 2003-04] when [plaintiff] was on medication. On these days there was a marked difference in his behavior as well as his ability to focus on the task at hand."). Dr. Handal's secondary diagnosis of Obsessive Compulsive Disorder (OCD) on this date is entirely new, and unrelated to the period for which benefits were denied; no previous mental health professional diagnosed plaintiff with this disorder, despite thorough examination. In addition, nothing in Dr. Handal's report indicates that plaintiff's OCD caused plaintiff to have any limitation in any domain of functioning. See Magill v. Commissioner of Social

---

[6] This GAF score also appears to be based largely on the report of plaintiff's mother, not on any independent observation by the physician. See R. 155 -157.

14

Sec., 147 Fed.Appx. 92, 96 (11th Cir. 2005) (Obsessive-compulsive disorder diagnosis was not material as it did not assess any new restrictions or limitations in addition to those already considered by the ALJ.).[7]

In sum, even assuming that this evidence is new and non-cumulative, and that there is good cause for the failure to submit the evidence at the administrative level, the additional records offered by plaintiff are not material as there is not a reasonable probability that they would change the administrative result.

## CONCLUSION

Upon its review of the record as a whole, the court concludes that the ALJ's decision should be AFFIRMED for the reasons set out above.  A separate judgment will be entered.

DONE, this 12th day of July, 2006.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

---

[7] In his reply brief, plaintiff argues for the first time that because plaintiff was referred to Dr. Handal by Dr. Ramsey, the "record might have been incomplete as it does not contain any record from Dr. Ramsey." Plaintiff's reply brief at 7. The court declines to consider this new argument, to which the Commissioner did not have an opportunity to respond. See, e.g., McCulley v. Allstates Technical Services, 2005 WL 1475314, *6 & n. 15 (S.D. Ala. 2005) (Issues raised in a reply brief are not properly before the court where they could and should have been presented previously and the movant has offered no explanation for the delay.); Lewis v. Mercedes-Benz USA, LLC, 2004 WL 3756384, *2 (N.D.Ga. 2004) ("This court will not consider arguments raised for the first time in a reply brief ."); Reliance Ins. Co. of Illinois, Inc. v. Richfield Hospitality Services, Inc., 92 F.Supp.2d 1329, *1332 (N.D. Ga. 2000) ("In general, a court should not consider arguments raised for the first time in a reply brief.").